IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.                                                            Case 2:08-cr-20280-SHM-cgc

**MARIO HAMPTON,**

        **Defendant.**

REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS STATEMENT

Before the Court is Defendant Mario Hampton's Motion to Suppress Statement. (Docket Entry "D.E." #74). The instant motion was referred to United States Magistrate Charmiane G. Claxton for Report and Recommendation. (D.E. #81).[1] For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress Statement be DENIED.

**I. Proposed Findings of Fact**

At approximately 11:00 p.m. on July 31, 2008,[2] officers with the Memphis Police Department Organized Crime Unit went to the Hillview Apartments in Memphis, Tennessee in

---

[1] The instant motion was filed on September 22, 2010. The United States was granted an extension of time to respond until January 3, 2011. (D.E. #80). The hearing on the instant motion was initially set for January 21, 2011 (D.E. #84), but it was continued until February 28, 2011 on motion of the Defendant. (D.E. #86). The hearing on the instant motion was held on February 28, 2011 and April 15, 2011.

[2] Officer Robert Trantham initially testified that the date of the incident was July 29, 2008; however, he later stated that he was incorrect and that the date was July 31, 2008. (Feb. 28, 2011 Tr. at 14, 27).

response to a number of complaints about drug activity from individuals that resided in the apartment complex. (Feb. 28, 2011 Tr. at 13-14, 27, 37, 58). Officer Robert Trantham,[3] Detective Graves, and Detective Haley entered the middle of the complex in an unmarked vehicle to look for suspicious behavior, and they exited their vehicle to talk to a large group of people. (Feb. 28, 2011 Tr. at 15-16, 39). At approximately the same time, Officer Keith Crosby, Detective Star Handley, and Officer Jay Robinson entered the complex in an unmarked vehicle, stopped at a different location in the front of the complex, and observed what they believed to be a narcotics transaction involving a "couple of hand-to-hand exchanges." (Feb. 28, 2011 Tr. at 16-17; Apr. 15, 2001 Tr. at 13). Officer Crosby, Detective Handley, and Officer Robinson "calmly" exited their vehicle wearing "OCU police vests" with "police" written across the chest and "drop holsters" with their firearms in plain view, they identified themselves as police officers, and they began to approach the suspects that they believed were involved. (Feb. 28, 2011 Tr. at 16-17; Apr. 15, 2001 Tr. at 13-14).

However, the officers "never even made it over to talk to them" because, before they "really got very far" from their vehicle, two individuals began firing shots at them, and Officer Grays[4] returned fire. (Feb. 28, 2011 Tr. at 17-18, 48-50, 99; Apr. 15, 2011 Tr. at 24). Approximately ten to fifteen shots were fired at first, and after a short pause, another two or three shots were fired. (Apr. 15, 2011 Tr. at 25). During the second round of shots, Officer Crosby saw a man in a black

---

[3] In the event that an officer's rank is not part of the record, the Court will use the general title of "Officer."

[4] The name of the officer that returned fire was transcribed as "Officer Grays." (Apr. 15, 2011 Tr. at 24). The record makes no other reference to an Officer Grays; however, the Court could not assume that this reference was to Detective Graves, because even though he was on the scene at the Hillview Apartments, he was part of the team that was at the middle of the complex when the shots were fired. (Feb. 28, 2011 Tr. at 15-16, 39). Ultimately, the identity of the officer that returned fire is not at issue in the instant motion.

t-shirt approximately seventy-five feet away running around a corner. (Apr. 15, 2011 Tr. at 23-24). The individual then turned around and fired a shot. (Apr. 15, 2011 Tr. at 25-27). Officer Crosby was certain that this individual fired the weapon because he could "see the flash from the gun." (Apr. 15, 2011 Tr. at 26-27). Both shooters fled the scene and were not immediately identified or apprehended. (Feb. 28, 2011 Tr. at 18, 50). After hearing shots fired, Officer Trantham, Detective Graves, and Detective Haley abandoned their attempt to interview the group of persons in the middle of the complex and approached the location where shots had been fired. (Feb. 28, 2011 Tr. at 56).

Immediately thereafter, an extensive investigation ensued that included both a criminal investigation into the individuals responsible for firing shots at the officers as well as an administrative investigation into the propriety of the shots returned. (Feb. 28, 2011 Tr. at 17-21, 98-101). In such situations, MPD protocol requires supervisory officers, security squad, a shoot team, and other personnel to be notified and to respond. (Feb. 28, 2011 Tr. at 17-19, 98-101). During the investigation, all officers involved in the event are required to remain on the scene until notified that the investigation is complete. (Feb. 28, 2011 Tr. at 20, 99).

In the initial stages of the investigation, Officer Crosby went to the location where he saw the suspect running and located in the shrubbery a .45 caliber firearm and a "large bag containing marijuana." (Apr. 15, 2011 Tr. at 15). Officer Crosby assigned an officer to watch the evidence that remained on the ground while other officers also continued searching the area for the suspect. (Apr. 15, 2011 Tr. at 15, 32-33, 35). Officer Crosby then noticed a male in a "fresh," unwrinkled red shirt with "mud around his ankles" that was sitting on the steps of the apartment building, and he proceeded to ask him general questions such as whether he knew anyone that would shoot at the police. (Apr. 15, 2011 Tr. at 16-17, 46-47). At this time, Officer Crosby had no reason to be

3

suspicious of this man, who would later be identified as the Defendant, and "didn't pay too much attention" to his clean shirt and muddied leg. (Apr. 15, 2011 Tr. at 16, 22).

Although the Defendant was initially hesitant, he later stated that he may have an idea of who might have shot at the police, and Officer Crosby advised that he may be able to become an informant if he did have such information. (Apr. 15, 2011 Tr. at 17, 33). The Defendant expressed interest in becoming an informant, and he said he "knew about guys with guns and dope." (Apr. 15, 2011 Tr. at 18). The Defendant then began to take Officer Crosby around the complex to point out locations where certain individuals that may be responsible for the incident frequented. (Apr. 15, 2011 Tr. at 33, 35-36). During this time, he kept inquiring about what Officer Crosby had found in the bushes. (Apr. 15, 2011 Tr. at 34, 37).

After the Defendant had spent approximately thirty-five to forty minutes with Officer Crosby showing him the locations where various individuals may be located, they returned to the same area of the apartment complex where Officer Crosby had first encountered the Defendant. (Apr. 15, 2011 Tr. at 18, 35, 45). Officer Crosby relieved the officer that was watching the evidence in the bushes, as he was still waiting on crime scene personnel and planned on staying in that vicinity with the Defendant, who was still not a suspect at that time. (Apr. 15, 2011 Tr. at 42-43).

While standing near the apartment complex, the Defendant asked to use Officer Crosby's phone on approximately three separate occasions. (Apr. 15, 2011 Tr. at 18, 20, 34, 37-38, 44). He made two calls in Officer Crosby's presence, but when he made a third call, he began walking away from Officer Crosby. (Apr. 15, 2011 Tr. at 40-41, 44). Despite Officer Crosby's orders to stop walking away, the man continued to walk away from Officer Crosby with his phone. (Apr. 15, 2011 Tr. at 40-41, 44). Officer Crosby initially followed the man around the corner of the building until

the evidence was almost no longer in view, but as he was doing so, he noticed a female on a cell phone approaching to within six to eight feet of the evidence that was still in the shrubberies. (Apr. 15, 2011 Tr. at 40-42, 45). Although he could not be certain, Officer Crosby believed that the woman was speaking with the Defendant on the phone and that she was working with him to try to remove the evidence. (Apr. 15, 2011 Tr. at 18-19, 42). When the female saw Officer Crosby, "she ducked and ran back around the building." (Apr. 15, 2011 Tr. at 18-19). Officer Crosby later came to believe based upon subsequent interactions with this woman that she was Defendant's girlfriend. (Apr. 15, 2011 Tr. at 20, 44-45).

Following this incident where Officer Crosby suspected Defendant of trying to lure him away from the evidence in an attempt to allow the female to remove it, Officer Crosby ordered him to return his phone and instructed Defendant to sit on the ground nearby him. (Apr. 15, 2011 Tr. at 19-20). Shortly thereafter, the officers were advised that a female in the vicinity had "flagged down" officers to report the suspect that shot at officers was a "black male with a light complexion, freckles, . . . [and] a red shirt . . ." and that he was currently talking with police. (Feb. 28, 2011 Tr. at 25; Apr. 15, 2011 Tr. at 19). As this description was "exactly consistent" with the description of the Defendant, Officer Crosby immediately detained Defendant. (Feb. 28, 2011 Tr. at 26; Apr. 15, 2011 Tr. at 19). Approximately fifteen other officers responded to Officer Crosby's position based upon the radio transmission. (Apr. 15, 2011 Tr. at 19-20).

At approximately 1:30 a.m. on August 1, 2008, Defendant was placed under arrest and was put into Officer James McDonald's marked squad car. (Feb. 28, 2011 Tr. at 64; Apr. 15, 2011 Tr. at 21). Officer McDonald remained outside the car along with one or two other officers, while Officer Crosby learned that Defendant had been previously banned from the property. (Feb. 28,

5

2011 Tr. at 71; Apr. 15, 2011 Tr. at 21).  Neither Officer Crosby nor Sergeant McDonald interviewed Defendant after he was detained, nor did they observe any other officers interview Defendant during this time.  (Feb. 28, 2011 Tr. at 64-65; Apr. 15, 2011 Tr. at 21-22).

When the investigation at the scene was completed at approximately 3:30 a.m., Officer McDonald transported Defendant to the Felony Response Office at the 201 Poplar jail.  (Feb. 28, 2011 Tr. at 71-72).  Defendant arrived at the Felony Response Office at approximately 3:45 a.m.  (Feb. 28, 2011 Tr. at 72).  Because the investigation was still ongoing and because witness interviews were in progress, Sergeant Stanley Johnson placed Defendant on a forty-eight hour hold at 6:41 a.m., the length of which began at 2:00 a.m., which was the time of the arrest ticket.  (Feb. 28, 2011 Tr. at 82-83).  Although it would have been Sergeant Johnson's responsibility to interview Defendant if any interviews were conducted, Sergeant Johnson did not interview Defendant or observe any other officers interview  Defendant during the time he was temporarily held at the Felony Response Office.  (Feb. 28, 2011 Tr. at 84).  Defendant left Sergeant Johnson's office at 6:41 a.m. to be booked into the jail during the remainder of his forty-eight hour hold.  (Feb. 28, 2011 Tr. at 84-85).  Defendant was booked into the jail at approximately 7:00 a.m.  (Feb. 28, 2011 Tr. at 91).   When the day-shift officers arrived at 8:00 a.m., the investigation into Defendant's role in the incident was assigned to Sergeant Steven Roach of the Felony Assault Unit of the Memphis Police Department.  (Feb. 28, 2011 Tr. at 94-97, 113).  As the investigation continued, Defendant remained in the jail holding until approximately 2:00 p.m.  (Feb. 28, 2011 Tr. at 101-102).  At approximately 2:00 p.m., Sergeant Roach and Detective Wilky transferred Defendant to a small interview room in the robbery unit and later to a larger interview room in the homicide unit to provide adequate space for the investigators and to allow Defendant room to eat a meal that he

6

was provided.  (Feb. 28, 2011 Tr. at 101-104, 109, 111-13, 137, 170).

At approximately 3:00 p.m., Sergeant Roach and Detective Shafer advised Defendant of his rights.  (Feb. 28, 2011 Tr. at 104-105, 119, 140).  Defendant was first asked to read the Advice of Rights form aloud to the officers, and he complied.  (Feb. 28, 2011 Tr. at 105-108, 143-44, 148-49, 154).  Defendant was then asked to execute the written Advice of Rights form.  (Feb. 28, 2011 Tr. at 105).  Defendant provided his name, date of birth, Social Security number, level of education, and demonstrated his ability to read and write without eyeglasses.  (Feb. 28, 2011 Tr. at 107, 130).

With respect to his waiver of rights, the Advice of Rights form demonstrates that Defendant was asked if he "understands the rights that have been explained to him," and Defendant wrote "yes" and initialed his response.  (Feb. 28, 2011 Tr. at 106 & Exh. 1).  The Advice of Rights form shows that Defendant was asked if, "[u]nderstanding those rights, do you wish to give a statement now," and Defendant wrote "yes" and initialed his response.  (Feb. 28, 2011 Tr. at 106-107 & Exh. 1).  Sergeant Roach also testified that he did not recall Defendant ever mentioning drug or alcohol consumption during the advice-of-rights process.  (Feb. 28, 2011 Tr. at 118-119).  Defendant signed the Advice of Rights form at approximately 3:05 p.m. in the presence of Sergeant Roach.  (Feb. 28, 2011 Tr. at 105).

Once the advice-of-rights process was complete, Sergeant Roach delegated the task of conducting Defendant's interview to Officer Chatman[5] and Detective Evans.  (Feb. 28, 2011 Tr. at 108-110, 112, 136-37).  Officer Chatman and Detective Evans began interviewing Defendant at 3:15 p.m.  (Feb. 28, 2011 Tr. at 121-22, 140).  Following several hours of questioning, Defendant

---

[5] In certain portions of the testimony, Officer Chatman's name is transcribed as "Chapman."  However, during his own testimony, his name is transcribed as "Chatman."  (Feb. 28, 2011 Tr. at 135).

7

executed his first signed statement at approximately 6:00 p.m. with a stenographer present. (Feb. 28, 2011 Tr. at 120-21, 145). Before this statement was taken, Defendant was again advised of his rights as follows:

> We are going to ask you some questions regarding the above complaint. You have the right to remain silent and anything you say can or will be used against you in a court of law. You have the right to have a lawyer, either of your own choice, or court appointed if you are unable to afford one, and to talk with your lawyer before answering any questions, and to have your lawyer with you during questioning if you wish.

(Feb. 28, 2011 Tr. at 142-49 & Exh. 2). Defendant again acknowledged that he understood these rights and still wished to provide a statement. (Feb. 28, 2011 Tr. at 144 & Exh. 2). Defendant affirmed that he gave the statement of his own free will, without threats, promises, or coercion from anyone and that he was not "currently under the influence of any intoxicants or drugs that may impair" his judgment. (Feb. 28, 2011 Tr. at Exh. 2).

After Defendant executed his first written statement, officers compared it to other information obtained in the investigation and noted certain discrepancies and inconsistencies. (Feb. 28, 2011 Tr. at 126, 173-74). During this time, Defendant remained in the holding cell and voluntarily laid on the floor to rest with no instruction from Sergeant Roach, Officer Chatman, or Detective Evans to do so. (Feb. 28, 2011 Tr. at 124, 127, 129, 148-50, 165, 173). When officers determined that further questioning of Defendant would be necessary to address the discrepancies, they awoke Defendant and continued to interview him. (Feb. 28, 2011 Tr. at 126, 162-63, 165-66). During this second interview, Defendant acknowledged that his previous statement was not entirely accurate. (Feb. 28, 2011 Tr. at 150). Based upon the newly provided information, officers determined that they needed to take a second written statement, and they contacted the stenographer and requested that she return to the location for its execution. (Feb. 28, 2011 Tr. at 150-51, 164).

At approximately 8:40 p.m., Defendant began his second written statement, which he executed and signed at approximately 9:00 pm. (Feb. 28, 2011 Tr. at 152-53). Before the second written statement, Defendant was advised of his rights for a third time and acknowledged that he understood his rights and still wished to give a statement. (Feb. 28, 2011 Tr. at 152, 188 & Exh. 3). Defendant again acknowledged that he elected to provide a statement of his own free will without threats, promises, or coercion and that he was not "currently under the influence of any intoxicants or drugs that may impair" his judgment. (Feb. 28, 2011 Tr. at Exh. 3).

With respect to Defendant's mental state during the interrogation period, Defendant claims that he had been awake since approximately 10:00 or 11:00 a.m. on July 31, 2008 and that, during that day, he had consumed "[a]bout a fifth" of cognac, between twelve and twenty-four "long neck" bottled beers, and some bourbon, which he admits was a usual amount of consumption for him. (Feb. 28, 2011 Tr. at 192-93). Defendant further stated that he was not under the influence of any drugs. (Feb. 28, 2011 Tr. at 194). Defendant claims that he "kept nodding off [and] kept falling asleep" because he was "tired and . . . had been drinking" and that he told officers about his exhaustion and intoxication. (Feb. 28, 2011 Tr. at 198, 204).

However, despite Defendant's testimony regarding his alcohol consumption, Sergeant Roach, Officer Chatman, and Detective Evans testified that he did not appear intoxicated, presented no signs of drug use or drinking, was not falling asleep as he was being questioned, and responded in an entirely coherent manner throughout the investigation. (Feb. 28, 2011 Tr. at 129-31, 138-139, 153-54, 172-73, 187). Sergeant Roach provided the example that, when he was confronted with evidence of his guilt in the form of a positive gunshot residue test, his "composure changed quite a bit" in a manner than led Sergeant Roach to believe that Defendant was entirely in touch with

9

reality. (Feb. 28, 2011 Tr. at 131). Further, Defendant was questioned about whether he was intoxicated in connection with his advice-of-rights process and he advised that he was not. (Feb. 28, 2011 Tr. at 184 & Exhs. 2, 3). Although Defendant states that he told the officers he was "tired," Detective Evans testified that he never mentioned being tired and never refused to continue the interview due to fatigue or any other reason. (Feb. 28, 2011 Tr. at 166, 174, 187, 198). Sergeant Roach and Officer Chatman further stated that, in general, individuals being interviewed are offered restroom breaks, "smoke breaks," food, and water approximately every hour and a half. (Feb. 28, 2011 Tr. at 127-28). Although the "supplement" on Defendant did not note precisely what he was offered, they opined that he would have been provided these standard opportunities and was "absolutely" offered the chance to go to the restroom, which he did, was offered food and water, which he accepted, and was offered "smoke breaks," which he utilized. (Feb. 28, 2011 Tr. at 127-28, 147-48, 156).

With respect to Defendant's right to counsel, Defendant asserts that he "almost continuous[ly]" requested an attorney from the point he was detained and throughout the questioning but that the officers refused and questioned him without regard to his request because they did not want to wait. (Feb. 28, 2011 Tr. at 196-97, 199). However, Sergeant Roach, Officer Chatman, and Detective Evans testified that Defendant never requested an attorney and acknowledged at all times when he was advised of his rights that he wished to make a statement without invoking his right to counsel. (Feb. 28, 2011 Tr. at 108, 148-49, 160, 174-75). Finally, with respect to his experience with the criminal justice system, Defendant admitted that he has been arrested over twenty-five times, that he has been questioned by police on previous occasions, and that he was "well aware" of his right to an attorney. (Feb. 28, 2011 Tr. at 200-02, 207-08).

Finally, with respect to whether Defendant had any court appearances on August 1, 2008 in connection with this case, and more specifically whether he may have been appointed counsel at any such appearance, the confusion on this point seems to have started when Defendant told Sergeant Roach on August 1, 2008 that he was tired from going to court earlier that day, which Sergeant Roach did not recall but which was noted in the supplement. (Feb. 28, 2011 Tr. at 114-16). However, Defendant never mentioned what issues he claimed he had gone to court for and never stated that he had been appointed an attorney in regard to the instant case. (Feb. 28, 2011 Tr. at 116). At the hearing, Defendant testified that he was not sure and could not remember if he went to court on August 1, 2008 or not. (Feb. 28, 2011 Tr. at 198). Sergeant Roach testified that he was never made aware that Defendant was taken anywhere other than from the holding cell to the interview rooms and that, had the Defendant been taken to court or another location, he should have been notified of that information. (Feb. 28, 2011 Tr. at 101-102). Detective Evans testified that he reviewed the "JSS system" of the Shelby County court, which did not list any court appearance for Defendant on August 1, 2008, although he admitted he did not have official court records to compare his results for accuracy. (Feb. 28, 2011 Tr. at 169-70). Further, the Inmate Logbook demonstrates that Defendant was only logged out from the jail from 1:44 p.m. until 9:25 p.m., which is consistent with the times during which Defendant was interviewed. (Apr. 15, 2011 Tr. at Exh. 1).[6]

---

[6] The Inmate Logbook has two listings for an individual named Mario Hampton on August 1, 2008. (Apr. 15, 2011 Tr. at Exh. 1). In association with booking number 08125886, it shows that Mario Hampton was logged out at 13:44, or 1:44 p.m., and was logged in at 9:25 p.m., although the numbers "231" are also noted beside this entry. (Id.). In this entry, it appears that the officer's name and the check-in time are transposed. (Id.). Another entry later in the day in the Inmate Logbook lists an individual named Mario Hampton with booking number 08125768, but it does not list any times for logging out or into the jail. (Id.). This second entry was the final entry of August 1, 2008 and appears to have been made after another entry logging an inmate out at 17:56, or 5:56 p.m., suggesting that it was made during evening hours when, if

## II. Proposed Conclusions of Law

### A. Invocation of Right to Counsel

First, Defendant's Motion to Suppress asserts that the arresting officers were aware that Defendant had invoked his right to counsel but that the officers ignored Defendant's invocation of that right and continued their interrogation of the Defendant. In Miranda v. Arizona, the Supreme Court concluded that, if a suspect in custodial interrogation "indicates in any manner at any stage of the process that he wishes to consult with an attorney before speaking, there can be no questioning." 384 U.S. at 436, 444-45 (1996). If an accused invokes his right to counsel, he may not be subjected to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

Upon review, the Court finds that Defendant did not invoke his right to counsel. Although Defendant claimed at the hearing on the instant motion that he "almost continuous[ly]" requested an attorney from the point he was detained and throughout the questioning, the record reflects that Defendant on three occasions acknowledged that he was aware of his right to counsel and wished to waive that right and make a statement. The record is confirmed by Sergeant Roach, Officer Chatman, and Detective Evans, who each testified that Defendant never requested an attorney and acknowledged at all times when he was advised of his rights that he wished to make a statement

---

any check-in or check-out occurred, would not have been during hours where he would have a scheduled court appearance. (Id.). Upon review of the Inmate Logbook, it appears there may have been a several mistakes made in logging the information; however, the Court is persuaded that the Inmate Logbook corroborates, albeit with only the slightest weight, the Government's assertion that Defendant was interviewed that afternoon and evening and did not have any morning court appearance. (Id.).

without invoking his right to counsel.

Further, Defendant has raised the possibility that he may have had a court appearance on the morning of August 1, 2008 before he was interviewed that afternoon, that he may have been appointed an attorney at that time, and that the officers were aware of his court appearance and potential appointment of counsel yet continued the interrogation. Although Sergeant Roach testified that the supplement states that Defendant generally mentioned something regarding court during his interactions with him, there is no evidence before the Court of any such appearance on August 1, 2008 made in connection with this case. In fact, all the evidence is to the contrary. The Shelby County JSS court calendar system does not reflect any matter in this case or otherwise involving Defendant. The jail Inmate Logbook only appears to reflect that Defendant was logged out from 1:44 p.m. until 9:25 p.m., which is consistent with the times he was interviewed in the afternoon and evening. There are no entries that reflect any morning transport of Defendant. Sergeant Roach confirmed that he should have been made aware of any court appearances that Defendant would have had that day, and he was not. Even Defendant testified that he was not sure and could not remember if he had any court appearance on August 1, 2008. Although Defendant had ample opportunity to present proof of any court appearance as well as any pre-interrogation appointment of counsel, Defendant did not to do so. Accordingly, the Court has no factual support for Defendant's assertion that he may have attended court on the morning of August 1, 2008 and that he may have been provided counsel in relation to this case on that occasion. In sum, the Court concludes that Defendant did not invoke his right to counsel and thus no constitutional violation occurred.

**B. Knowing and Voluntary Waiver of Rights**

13

Next, the Defendant asserts that he did not knowingly and voluntarily waive his right against self-incrimination because he was subjected to "coercion and sleep deprivation." (Def.'s Mot. To Suppress at 2, ¶b). The Fifth Amendment to the United States Constitution prohibits an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Under Miranda v. Arizona, 384 U.S. 436, 479 (1966), an individual that is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning" must be provided information on the following "[p]rocedural safeguards" to protect his privilege against self-incrimination:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id.; see also Duckworth v. Eagan, 492 U.S. 195, 201 (1989).

A suspect may elect to waive his Miranda rights if the waiver is made "voluntarily, knowingly and intelligently." 384 U.S. at 444. The inquiry into whether a proper waiver was made has "two distinct dimensions." Moran v. Burbine, 475 U.S. 412, 421 (1986):

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Id. (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)). With respect to a knowing and intelligent waiver, the totality of the circumstances can include such factors as "age, education, and intelligence of the defendant; whether the defendant has been informed of his Miranda rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of

14

physical punishment, such as deprivation of food or sleep." Murphy v. Ohio, 551 F.3d 485, 511 (6th Cir. 2009) (citing McCalvin v. Yukins, 444 F.3d 713, 719 (6th Cir. 2006)). The government bears the burden of demonstrating both that the Miranda warnings were properly provided and that a suspect voluntarily, knowingly, and intelligently waived his rights. 384 U.S. at 479.

Upon review, the Court initially notes that Defendant has not challenged whether his statement was voluntarily given; however, the Court finds that the statement was voluntarily given based upon Defendant's own affirmation on two occasions that his statements were of his "own free will, without threats, promises, or coercion from anyone" and based upon the absence of any evidence to the contrary.

With respect to whether Defendant's waiver was knowing and intelligent, Defendant argues that his alleged deprivation of sleep rendered his waiver of his rights to be unknowing and unintelligent. However, the Court finds that the record does not support this conclusion. Although the Court accredits the testimony that Defendant awoke between 10:00 a.m. and 11:00 a.m. on July 31, 2008, was arrested in the late evening hours, was held into the early morning hours of August 1, 2008, and was interrogated in the afternoon and early evening of August 1, 2008, the Court does not find that this information is sufficient to require the conclusion that Defendant was too exhausted to knowingly and voluntarily waive his constitutional rights and provide two statements over a period of six hours. All officers that interviewed Defendant found him to be functional, coherent, and showing no signs that he was not able to knowingly and intelligently respond. And perhaps most telling, the record does not reflect that at any time, Defendant stated that he was simply too exhausted to continue. On the contrary, on each of the three occasions Defendant was advised of his rights, he stated that he wished to proceed and provide a statement.

Next, although it is not explicitly addressed in the Motion to Suppress, at the February 28, 2011 hearing on the instant motion, Defendant claimed that he had consumed a large quantity of alcohol on July 31, 2008, apparently suggesting that he was not able to knowingly and intelligently waive his rights due to intoxication. However, once again, the record does not support this contention. Specifically, Defendant twice affirmed during his August 1, 2008 interrogations that he was not "currently under the influence of any intoxicants or drugs that may impair [his] judgement." Additionally, all officers that interacted with him testified that he was coherent, responding in a clear and understandable manner, and demonstrated no signs of intoxication or an inability to comprehend his rights.

Furthermore, the United States Court of Appeals for the Sixth Circuit has addressed whether a waiver of rights can be knowing and intelligent after "earlier ingestion of alcohol and drugs" and "lack of sleep and sustenance." See Wernert v. Arn, 819 F.2d 613, 616 (6th Cir. 1987). The Wernert court concluded that, even assuming that the defendant's "account of her drug and alcohol ingestion was truthful (and one witness said [defendant] would have died if it was),"[7] officers testified that the defendant appeared "'normal'" at all times. Id. Accordingly, the Sixth Circuit concluded that the "evidence simply does not indicate that [defendant] lacked the ability to make a voluntary and intelligent waiver of her rights." Id.[8] Other Courts of Appeals have reached the

---

[7] In this case, the Court questions Defendant's account of his alcohol consumption and the extent to which it may have been exaggerated. Specifically, Defendant intially responded that he only consumed cognac and bourbon. (Feb. 28, 2011 Tr. at 192). When his attorney apparently thought he had said "beer," he asked, "[w]hen you say a little beer, tell me what you drank exactly?" (Feb. 28, 2011 Tr. at 192). It is only then that Defendant volunteers that he drank an excessive quantity of twelve to twenty-four beers. (Feb. 28, 2011 Tr. at 192-93).

[8] In Wernert, the defendant was additionally inexperienced with law enforcement procedures and was concerned about the welfare of her child. However, in the instant case,

16

same conclusion.  See United States v. Brown, 287 F.3d 965, 983 (10th Cir. 2002) (valid waiver despite intoxication and alcohol withdrawal because defendant did not present symptoms); Shackelford v. Hubberd, 234 F.3d 1072, 1080-81 (9th Cir. 2000) (valid waiver despite defendant's cocaine use because he was coherent, articulate, and asked lucid questions during interrogation); United States v. Palmer, 203 F.3d 55, 60-61 (1st Cir. 2000) (valid waiver despite heroin withdrawal combined with use of anti-depressants); United States v. Garcia Abrego, 141 F.3d 142, 169 (5th Cir. 1998) (valid waiver despite defendant's heavy dose of Valium because defendant was habitual used who could have developed tolerance); United States v. Korn, 138 F.3d 1239, 1240 (8th Cir. 1998) (valid waiver despite defendant's assertion that he was under the influence of drugs); United States v. Williams, 128 F.3d 1128 (7th Cir. 1997) (valid waiver despite heroin withdrawal because defendant was acting normally at the time of the statement); United States v. Lincoln, 992 F.2d 356, 359 (D.C.Cir. 1993) (valid waiver despite defendant's intoxication because defendant did not show signs of impairment).

Finally, in considering the totality of the circumstances, Defendant was thirty-two years old at the time of his interrogation, was able to read and write, and had an tenth grade education. Defendant was advised of his Miranda rights on three occasions within a period of approximately six hours: before any questioning began; before the taking of the first official statement; and before the taking of the second official statement.  The questioning only took place for approximately six hours during an afternoon and early evening.  There record reflects that Defendant was not subjected to any official coercion or deprivation of food, water, or sleep.  On the contrary, Defendant twice

---

Defendant has been arrested approximately twenty-five times, questioned on previous occasions, and affirms that he was well aware of his right to counsel and was familiar with the criminal justice system.

17

affirmed that he sought to provide the statement of his "own free will, without threats, promises, or coercion from anyone." Further, Defendant was provided a "combo" meal from Wendy's restaurant, including a hamburger, fries, and soda before he began the interview, and he was frequently offered restroom breaks and water. As the Wernert court concluded, "[l]ack of sustenance could not have been too serious an impairment" when the individual has had a recent meal, 819 F.2d at 616, which Defendant was provided immediately before his interview. Accordingly, the Court concludes that the totality of the circumstances demonstrates that the Government has met its burden that the Miranda warnings were properly provided and that the Defendant voluntarily, knowingly, and intelligently waived his rights. Thus, the Court finds that no constitutional violation occurred.

### III. Conclusion

For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress be DENIED.

**DATED** this 12th day of August, 2011.

                             s/ Charmiane G. Claxton
                             CHARMIANE G. CLAXTON
                             UNITED STATES MAGISTRATE JUDGE


**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**